# OPINIONS OF THE JUSTICES.

## OPINIONS OF THE JUSTICES TO THE SENATE.

*License. Marriage. Statute,* Construction. *Constitutional Law,* Equal protection of laws. *Due Process of Law,* Marriage. *Words,* "Marriage," "Civil union."

A certain bill pending before the General Court, prohibiting same-sex couples from entering into marriage but allowing them to form civil unions with all "benefits, protections, rights, and responsibilities" of marriage, did not comply with the equal protection and due process requirements of the Massachusetts Constitution and arts. 1, 6, 7, and 10 of the Massachusetts Declaration of Rights, because although the pending bill palliated some of the financial and other concrete manifestations of the discrimination at issue in *Goodridge* v. *Department of Pub. Health, ante* 309 (2003), the bill maintained an unconstitutional, inferior, and discriminatory second-class citizen status for same-sex couples by excluding them from the institution of civil marriage; moreover, the bill's remaining provisions were too entwined with this purpose to stand independently. [1205-1210] SPINA, J., SOSMAN, J., CORDY, J., dissenting.

On February 3, 2004, the Justices submitted the following answer to a question propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit their answers to the question set forth in an order adopted by the Senate on December 11, 2003, and transmitted to the Justices on December 12, 2003. The order indicates that there is pending before the General Court a bill, Senate No. 2175, entitled "An Act relative to civil unions." A copy of the bill was transmitted with the order. As we describe more fully below, the bill adds G. L. c. 207A to the General Laws, which provides for the establishment of "civil unions" for same-sex "spouses," provided the individuals meet certain qualifications described in the bill.[1]

---

[1]The bill also amends G. L. c. 151B by prohibiting discrimination against civilly joined spouses.

The order indicates that grave doubt exists as to the constitutionality of the bill if enacted into law and requests the opinions of the Justices on the following "important question of law":

> "Does Senate, No. 2175, which prohibits same-sex couples from entering into marriage but allows them to form civil unions with all 'benefits, protections, rights and responsibilities' of marriage, comply with the equal protection and due process requirements of the Constitution of the Commonwealth and articles 1, 6, 7, 10, 12 and 16 of the Declaration of Rights?"[2]

Under Part II, c. 3, art. 2, of the Constitution of the Commonwealth, as amended by art. 85 of the Amendments, "[e]ach branch of the legislature, as well as the governor or the council, shall have authority to require the opinions of the justices of the supreme judicial court, upon important questions of law, and upon solemn occasions." "[A] solemn occasion exists 'when the Governor or either branch of the Legislature, having some action in view, has serious doubts as to their power and authority to take such action, under the Constitution, or under existing statutes.' " *Answer of the Justices*, 364 Mass. 838, 844 (1973),

---

[2]Article 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution, provides: "All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

Article 6 of the Massachusetts Declaration of Rights provides: "No . . . men, have any other title to obtain advantages, or particular and exclusive privileges, distinct from those of the community, than what arises from the consideration of services rendered to the public . . . ."

Article 7 of the Massachusetts Declaration of Rights provides, in relevant part: "Government is instituted for the common good; for the protection, safety, prosperity, and happiness of the people; and not for the profit, honor, or private interest of any one man, family or class of men . . . ."

Article 10 of the Massachusetts Declaration of Rights provides, in relevant part: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. . . ."

Because our determination does not turn on art. 12 or art. 16, we do not recite them here. See *Goodridge* v. *Department of Pub. Health, ante* 309, 316 n.8 (2003) (*Goodridge*).

quoting *Answer of the Justices*, 148 Mass. 623, 626 (1889). The pending bill involves an important question of law and the Senate has indicated "grave doubt" as to its constitutionality. We therefore address the question. See *Opinion of the Justices*, 430 Mass. 1205, 1207 (2000).

1. *Background of the proposed legislation.* In *Goodridge* v. *Department of Pub. Health, ante* 309 (2003) (*Goodridge*), the court considered the constitutional question "[w]hether the Commonwealth may use its formidable regulatory authority to bar same-sex couples from civil marriage . . . ." *Id.* at 312-313. The court concluded that it may not do so, determining that the Commonwealth had failed to articulate a rational basis for denying civil marriage to same-sex couples. The court stated that the Massachusetts Constitution "affirms the dignity and equality of all individuals" and "forbids the creation of second-class citizens." *Id.* at 312. The court concluded that in "[l]imiting the protections, benefits, and obligations of civil marriage to opposite-sex couples," G. L. c. 207, the marriage licensing law, "violates the basic premises of individual liberty and equality under law protected by the Massachusetts Constitution." *Goodridge* at 342.

In so concluding, the court enumerated some of the concrete tangible benefits that flow from civil marriage, including, but not limited to, rights in property, probate, tax, and evidence law that are conferred on married couples. *Id.* at 322-325. The court also noted that "intangible benefits flow from marriage," *id.* at 322, intangibles that are important components of marriage as a "civil right." *Id.* at 325. The court stated that "[m]arriage also bestows enormous private and social advantages on those who choose to marry . . . [and] is at once a deeply personal commitment to another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity, and family." *Id.* at 322. "Because it fulfils yearnings for security, safe haven, and connection that express our common humanity, civil marriage is an esteemed institution, and the decision whether and whom to marry is among life's momentous acts of self-definition." *Id.* Therefore, without the right to choose to marry, same-sex couples are not only denied full protection of the laws, but are "excluded from the full range of human experience." *Id.* at 326.

The court stated that the denial of civil marital status "works a deep and scarring hardship on a very real segment of the

community for no rational reason." *Id.* at 341. These omnipresent hardships include, but are by no means limited to, the absence of predictable rules of child support and property division, and even uncertainty concerning whether one will be allowed to visit one's sick child or one's partner in a hospital. See, e.g., *id.* at 315 n.6, 335. See also *id.* at 348 (Greaney, J., concurring) ("The continued maintenance of this caste-like system is irreconcilable with, indeed, totally repugnant to, the State's strong interest in the welfare of all children and its primary focus . . . on 'the best interests of the child' "). All of these stem from the status of same-sex couples and their children as "outliers to the marriage laws." *Id.* at 335. After reviewing the marriage ban under the deferential rational basis standard, the court concluded that the Department of Public Health "failed to identify any relevant characteristic that would justify shutting the door to civil marriage to a person who wishes to marry someone of the same sex." *Id.* at 341.

The *Goodridge* decision by the court made no reference to the concept of "civil unions," nor did the separate concurring opinion of Justice Greaney. Rather, it was the lawfulness under the Massachusetts Constitution of the bar to civil marriage itself, "a vital social institution," *id.* at 313, that the court was asked to decide. The court decided the question after extensively reviewing the government's justifications for the marriage ban.

In response to the plaintiffs' specific request for relief, the court preserved the marriage licensing statute, but refined the common-law definition of civil marriage to mean "the voluntary union of two persons as spouses, to the exclusion of all others." *Id.* at 343. The entry of judgment was stayed "for 180 days to permit the Legislature to take such action as it may deem appropriate." *Id.* at 344. The purpose of the stay was to afford the Legislature an opportunity to conform the existing statutes to the provisions of the *Goodridge* decision.

2. *Provisions of the bill.* The order of the Senate plainly reflects that Senate No. 2175 is proposed action in response to the *Goodridge* opinion. The bill states that the "purpose" of the act is to provide "eligible same-sex couples the opportunity to obtain the benefits, protections, rights and responsibilities afforded to opposite sex couples by the marriage laws of the commonwealth, without entering into a marriage," declares that it is the "public policy" of the Commonwealth that "spouses in a civil union" "shall have all the benefits, protections, rights

and responsibilities afforded by the marriage laws," Senate No. 2175, § 2, and recites "that the Commonwealth's laws should be revised to give same-sex couples the opportunity to obtain the legal protections, benefits, rights and responsibilities associated with civil marriage, while preserving the traditional, historic nature and meaning of the institution of civil marriage." *Id.* at § 1. To that end, the bill proposes G. L. c. 207A, which establishes the institution of "civil union," eligibility for which is limited to "[t]wo persons . . . [who] are of the same sex . . . ."

The proposed law states that "spouses" in a civil union shall be "joined in it with a legal status equivalent to marriage." Senate No. 2175, § 5. The bill expressly maintains that "marriage" is reserved exclusively for opposite-sex couples by providing that "[p]ersons eligible to form a civil union with each other under this chapter shall not be eligible to enter into a marriage with each other under chapter 207." *Id.* Notwithstanding, the proposed law purports to make the institution of a "civil union" parallel to the institution of civil "marriage." For example, the bill provides that "spouses in a civil union shall have all the same benefits, protections, rights and responsibilities under law as are granted to spouses in a marriage." In addition, terms that denote spousal relationships, such as "husband," "wife," "family," and "next of kin," are to be interpreted to include spouses in a civil union "as those terms are used in any law." *Id.* The bill goes on to enumerate a nonexclusive list of the legal benefits that will adhere to spouses in a civil union, including property rights, joint State income tax filing, evidentiary rights, rights to veteran benefits and group insurance, and the right to the issuance of a "civil union" license, identical to a marriage license under G. L. c. 207, "as if a civil union was a marriage."

3. *Analysis.* As we stated above, in *Goodridge* the court was asked to consider the constitutional question "whether the Commonwealth may use its formidable regulatory authority to bar same-sex couples from civil marriage." The court has answered the question. We have now been asked to render an advisory opinion on Senate No. 2175, which creates a new legal status, "civil union," that is purportedly equal to "marriage," yet separate from it. The constitutional difficulty of the proposed civil union bill is evident in its stated purpose to "preserv[e] the traditional, historic nature and meaning of the institution of civil

marriage." Senate No. 2175, § 1. Preserving the institution of civil marriage is of course a legislative priority of the highest order, and one to which the Justices accord the General Court the greatest deference. We recognize the efforts of the Senate to draft a bill in conformity with the *Goodridge* opinion. Yet the bill, as we read it, does nothing to "preserve" the civil marriage law, only its constitutional infirmity. This is not a matter of social policy but of constitutional interpretation. As the court concluded in *Goodridge*, the traditional, historic nature and meaning of civil marriage in Massachusetts is as a wholly secular and dynamic legal institution, the governmental aim of which is to encourage stable adult relationships for the good of the individual and of the community, especially its children. The very nature and purpose of civil marriage, the court concluded, renders unconstitutional any attempt to ban all same-sex couples, *as* same-sex couples, from entering into civil marriage.

The same defects of rationality evident in the marriage ban considered in *Goodridge* are evident in, if not exaggerated by, Senate No. 2175. Segregating same-sex unions from opposite-sex unions cannot possibly be held rationally to advance or "preserve" what we stated in *Goodridge* were the Commonwealth's legitimate interests in procreation, child rearing, and the conservation of resources. See *Goodridge, supra* at 341. Because the proposed law by its express terms forbids same-sex couples entry into civil marriage, it continues to relegate same-sex couples to a different status. The holding in *Goodridge*, by which we are bound, is that group classifications based on unsupportable distinctions, such as that embodied in the proposed bill, are invalid under the Massachusetts Constitution. The history of our nation has demonstrated that separate is seldom, if ever, equal.[3]

In *Goodridge*, the court acknowledged, as we do here, that

---

[3]The separate opinion of Justice Sosman (separate opinion) correctly notes that this court has not recognized sexual orientation as a suspect classification. It does so by referring to *Brown v. Board of Educ.*, 347 U.S. 483 (1954), and stating that that case "involved a classification . . . that is expressly prohibited by our Constitution." *Post* at 1221 n.6. The *Brown* case was decided under the Federal Constitution and made no reference to "suspect classifications." It held that "separate but equal" segregation in the context of public schools violated "the equal protection of the laws guaranteed by the Fourteenth Amendment" to the United States Constitution. *Brown v. Board of Educ., supra* at 495. The Fourteenth Amendment does not expressly prohibit discrimina-

"[m]any people hold deep-seated religious, moral, and ethical convictions that marriage should be limited to the union of one man and one woman, and that homosexual conduct is immoral. Many hold equally strong religious, moral, and ethical convictions that same-sex couples are entitled to be married, and that homosexual persons should be treated no differently than their heterosexual neighbors." *Id.* at 312. The court stated then, and we reaffirm, that the State may not interfere with these convictions, or with the decision of any religion to refuse to perform religious marriages of same-sex couples. *Id.* at 337-338 n.29. These matters of belief and conviction are properly outside the reach of judicial review or government interference. But neither may the government, under the guise of protecting "traditional" values, even if they be the traditional values of the majority, enshrine in law an invidious discrimination that our Constitution, "as a charter of governance for every person properly within its reach," forbids. *Id.* at 312.

The bill's absolute prohibition of the use of the word "marriage" by "spouses" who are the same sex is more than semantic. The dissimilitude between the terms "civil marriage" and "civil union" is not innocuous; it is a considered choice of language that reflects a demonstrable assigning of same-sex, largely homosexual, couples to second-class status. The denomination of this difference by the separate opinion of Justice Sosman (separate opinion) as merely a "squabble over the name to be used" so clearly misses the point that further discussion appears to be useless.[4] *Post* at 1211. If, as the separate opinion posits, the proponents of the bill believe that

---

tion against any particular class of persons, racial, religious, sexual, or otherwise, but instead elegantly decries the denial of equal protection of the laws "to any person" within the jurisdiction of the United States. Similarly, our decision in *Goodridge* did not depend on reading a particular suspect class into the Massachusetts Constitution, but on the equally elegant and universal pronouncements of that document. See note 2, *supra*.

In any event, we fail to understand why the separate opinion chastises us for adopting the constitutional test (rational basis) that is more likely to permit the legislation at issue. We did not apply a strict scrutiny standard in *Goodridge*. Under the even more lenient rational basis test, nothing presented to us as a justification for the existing distinction was in any way rationally related to the objectives of the marriage laws. Now, we answer that this proposed legislation fails to provide a rational basis for the different nomenclature.

[4]The separate opinion enlists Shakespeare in the cause of trying to convince us that words are unimportant. *Post* at 1211 n.1. But whatever may pertain to

no message is conveyed by eschewing the word "marriage" and replacing it with "civil union" for same-sex "spouses," we doubt that the attempt to circumvent the court's decision in *Goodridge* would be so purposeful. For no rational reason the marriage laws of the Commonwealth discriminate against a defined class; no amount of tinkering with language will eradicate that stain. The bill would have the effect of maintaining and fostering a stigma of exclusion that the Constitution prohibits. It would deny to same-sex "spouses" only a status that is specially recognized in society and has significant social and other advantages. The Massachusetts Constitution, as was explained in the *Goodridge* opinion, does not permit such invidious discrimination, no matter how well intentioned.

The separate opinion maintains that, because same-sex civil marriage is not recognized under Federal law and the law of many States, there is a rational basis for the Commonwealth to distinguish same-sex from opposite-sex "spouses." *Post* at 1213. There is nothing in the bill, including its careful and comprehensive findings (see Senate No. 2175, § 1), to suggest that the rationale for the bill's distinct nomenclature was chosen out of deference to other jurisdictions. This is but a post hoc, imaginative theory created in the separate opinion to justify different treatment for a discrete class. Even if the different term were used for the reason the separate opinion posits, and not in order to label the unions of same-sex couples as less worthy than those of opposite sex couples, we would remain unpersuaded. "Our concern," as the court stated in *Goodridge*, "is with the Massachusetts Constitution as a charter of governance for every person properly within its reach." *Id.* at 312.

We are well aware that current Federal law prohibits recognition by the Federal government of the validity of same-sex marriages legally entered into in any State, and that it permits other States to refuse to recognize the validity of such marriages. The argument in the separate opinion that, apart from the legal

---

two teenagers in love does not disguise the importance of the choice of words employed by the government to discriminate between two groups of persons regulated in their conduct by the government. The separate opinion fails to appreciate that it is not the word "union" that incorporates a pejorative value judgment, but the distinction between the words "marriage" and "union." If, as the separate opinion suggests, the Legislature were to jettison the term "marriage" altogether, it might well be rational and permissible. *Post* at 1219 n.5. What is not permissible is to retain the word for some and not for others, with all the distinctions thereby engendered.

process, society will still accord a lesser status to those marriages is irrelevant. Courts define what is constitutionally permissible, and the Massachusetts Constitution does not permit this type of labeling. That there may remain personal residual prejudice against same-sex couples is a proposition all too familiar to other disadvantaged groups. That such prejudice exists is not a reason to insist on less than the Constitution requires. We do not abrogate the fullest measure of protection to which residents of the Commonwealth are entitled under the Massachusetts Constitution. Indeed, we would do a grave disservice to every Massachusetts resident, and to our constitutional duty to interpret the law, to conclude that the strong protection of individual rights guaranteed by the Massachusetts Constitution should not be available to their fullest extent in the Commonwealth because those rights may not be acknowledged elsewhere. We do not resolve, nor would we attempt to, the consequences of our holding in other jurisdictions. See *id.* at 340-341.[5] But, as the court held in *Goodridge*, under our Federal system of dual sovereignty, and subject to the minimum requirements of the Fourteenth Amendment to the United States Constitution, "each State is free to address difficult issues of individual liberty in the manner its own Constitution demands." *Id.* at 341.

We recognize that the pending bill palliates some of the financial and other concrete manifestations of the discrimination at issue in *Goodridge*. But the question the court considered in *Goodridge* was not only whether it was proper to withhold tangible benefits from same-sex couples, but also whether it was constitutional to create a separate class of citizens by status discrimination, and withhold from that class the right to participate in the institution of civil marriage, along with its concomitant tangible and intangible protections, benefits, rights, and responsibilities. Maintaining a second-class citizen status for same-sex couples by excluding them from the institution of civil marriage *is* the constitutional infirmity at issue.

4. *Conclusion.* We are of the opinion that Senate No. 2175 violates the equal protection and due process requirements of the Constitution of the Commonwealth and the Massachusetts Declaration of Rights. Further, the particular provisions that

---

[5]Nor are we unaware that revisions will be necessary to effectuate the administrative details of our decision. These alterations can be made without perpetuating the discrimination that flows from separate nomenclature.

render the pending bill unconstitutional, §§ 2 and 3 of proposed G. L. c. 207A, are not severable from the remainder. The bill maintains an unconstitutional, inferior, and discriminatory status for same-sex couples, and the bill's remaining provisions are too entwined with this purpose to stand independently. See *Murphy* v. *Commissioner of the Dep't of Indus. Accs.*, 418 Mass. 165, 169 (1994).

The answer to the question is "No."

The foregoing answer and opinion are submitted by the Chief Justice and the Associate Justices subscribing hereto on the third day of February, 2004.

MARGARET H. MARSHALL

JOHN M. GREANEY

RODERICK L. IRELAND

JUDITH A. COWIN

In response to this court's decision in *Goodridge* v. *Department of Pub. Health, ante* 309 (2003) (*Goodridge*), the Senate is considering a bill that would make available to same-sex couples all of the protections, benefits, rights, responsibilities, and legal incidents that are now available to married opposite-sex couples, but would denominate the legal relationship thus created as a "civil union" instead of a civil "marriage." The question submitted to us by the Senate thus asks, in substance, whether the Massachusetts Constitution would be violated by utilizing the term "civil union" instead of "marriage" to identify the otherwise identical package of State law rights and benefits to be made available to same-sex couples.

In response to the court's invitation to submit amicus briefs on this question, we have received, from both sides of the issue, impassioned and sweeping rhetoric out of all proportion to the narrow question before us. Both sides appear to have ignored the fundamental import of the proposed legislation, namely, that same-sex couples who are civilly "united" will have literally every single right, privilege, benefit, and obligation of every sort that our State law confers on opposite-sex couples who are civilly "married." Under this proposed bill, there are no substantive differences left to dispute — there is only, on both sides, a

squabble over the name to be used.[1] There is, from the amici on one side, an implacable determination to retain some distinction, however trivial, between the institution created for same-sex couples and the institution that is available to opposite-sex couples. And, from the amici on the other side, there is an equally implacable determination that no distinction, no matter how meaningless, be tolerated. As a result, we have a pitched battle over who gets to use the "m" word.

This does not strike me as a dispute of any constitutional dimension whatsoever, and today's response from the Justices — unsurprisingly — cites to no precedent suggesting that the choice of differing titles for various statutory programs has ever posed an issue of constitutional dimension, here or anywhere else. And, rather than engage in any constitutional analysis of the claimed statutory naming rights, today's answer to the Senate's question merely repeats the impassioned rhetoric that has been submitted to us as if it were constitutional law, opining that any difference in names represents an "attempt to circumvent" the court's decision in *Goodridge*. *Ante* at 1208.

A principal premise of the Justices' answer is that this specific issue has somehow already been decided by *Goodridge*. It has not. In *Goodridge*, the court was presented with a statutory scheme that afforded same-sex couples absolutely *none* of the benefits, rights, or privileges that opposite-sex couples could obtain under Massachusetts law by way of civil marriage. At length, the *Goodridge* opinion identified the vast array of benefits, rights, and privileges that were effectively withheld from same-sex couples (and their children), *Goodridge, supra* at 323-325, and concluded that "[l]imiting the protections, benefits, and obligations of civil marriage to opposite-sex couples violates the basic premises of individual liberty and equality under law protected by the Massachusetts Constitution." *Id.* at 342. The ostensible reasoning behind that conclusion was that there was

---

[1]The insignificance of according a different name to the same thing has long been recognized:

"What's in a name? That which we call a rose
By any other name would smell as sweet;
So Romeo would, were he not Romeo call'd,
Retain that dear perfection which he owes
Without that title."

W. Shakespeare, Romeo and Juliet, act 2, sc. 2.

no "rational basis" for depriving same-sex couples (and their children) of those protections, benefits, and obligations. *Id.* at 331, 341.

Today's question presents the court with the diametric opposite of the statutory scheme reviewed in *Goodridge.* Where the prior scheme accorded same-sex couples (and their children) absolutely *none* of the benefits, rights, or privileges that State law confers on opposite-sex married couples (and their children), the proposed bill would accord them *all* of those substantive benefits, rights, and privileges. Nothing in *Goodridge* addressed the very limited issue that is presented by the question now before us, i.e., whether the Constitution mandates that the license that qualifies same-sex couples for that identical array of State law benefits, rights, and privileges be called a "marriage" license. In other words, where *Goodridge* addressed whether there was any rational basis for the enormous substantive difference between the treatment of same-sex couples and the treatment of opposite-sex couples, the present question from the Senate asks whether a single difference in form alone — the name of the licensing scheme — would violate the Constitution. Repeated quotations of dicta from *Goodridge* — which is essentially all that today's answer to the Senate consists of — simply does not answer the question that is before us.

Rather, according to *Goodridge* itself, we must consider whether there is any "rational basis" for giving the licensure program for same-sex couples a different name from the licensure program for opposite-sex couples, despite the fact that the two programs confer identical benefits, rights, and privileges under State law. Nowhere does today's answer to the Senate actually analyze whether there is or is not a conceivable rational basis for that distinction in name. Instead, the answer pays lip service to the rational basis test in a footnote and, in conclusory fashion, announces that, because the different name would still connote "a different status," it somehow lacks a rational basis and is contrary to *Goodridge. Ante* at 1206 & n.3, 1208.

While we have no precedent for the application of the rational basis test (or the strict scrutiny test, for that matter) to as insignificant an issue as what a statutory program is to be called, it would seem logical that the Legislature could call a program by a different name as long as there was any difference between that program and the other program in question. The black-letter law concerning the extremely deferential nature of the rational basis test should not need to be repeated here. Suffice it

to say that a statutory classification need be supported only "by a conceivable, rational basis," *Fine* v. *Contributory Retirement Appeal Bd.*, 401 Mass. 639, 641 (1988), and that the Legislature "is not required to justify its classifications, nor to provide a record or finding in support of them." *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 650 (1977). As such, a statute is not rendered infirm by its failure to recite a rational basis for its enactment, nor are we limited to a consideration of any specific basis identified by the statute itself. "[I]t is irrelevant for constitutional analysis whether a reason now advanced in support of a statutory classification is one that actually motivated the Legislature." *Prudential Ins. Co.* v. *Commissioner of Revenue*, 429 Mass. 560, 568 (1999), citing *FCC* v. *Beach Communications, Inc.*, 508 U.S. 307, 315 (1993).

At first blush, one would say that the very identity between the package of benefits, rights, and privileges accorded same-sex couples under the proposed bill and the package of benefits, rights, and privileges accorded opposite-sex couples under existing State law means that there is no reason to give those two packages different names. Where the stated purpose of the proposed bill is to eliminate all substantive differences between those two types of couples, what conceivable purpose is served by retaining a different title for their respective licensing schemes?

The problem, however, is simple: it is beyond the ability of the Legislature — and even beyond the ability of this court, no matter how activist it becomes in support of this cause — to confer a package of benefits and obligations on same-sex "married" couples that would be truly identical to the entire package of benefits and obligations that being "married" confers on opposite-sex couples. That difference stems from the fact that, *Goodridge* notwithstanding, neither Federal law nor the law of other States will recognize same-sex couples as "married" merely because Massachusetts has given them a license called a "marriage" license. That fact, by itself, will result in many substantive differences between what it would mean for a same-sex couple to receive a Massachusetts "marriage" license and what it means for an opposite-sex couple to receive a Massachusetts "marriage" license. Those differences are real and, in some cases, quite stark. Their very existence makes it rational to call the license issued to same-sex couples by a different name, as it unavoidably — and, to many, regrettably — cannot

confer a truly equal package of rights, privileges, and benefits on those couples, no matter what name it is given.

Just as *Goodridge* identified the vast array of State benefits, rights, and privileges that are conferred based on marital status, a vast array of Federal benefits, rights, and privileges are also conferred based on marital status. However, whatever Massachusetts chooses to call the license it grants to same-sex couples, the Federal government will not, for purposes of *any* Federal statute or program, treat it as a "marriage." See 1 U.S.C. § 7 (2000) ("In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife"). As such, same-sex "married" couples will not be treated as "married" for such purposes as Federal taxation (both income taxes and, even more significantly, estate taxes), Social Security benefits (of any kind), immigration, or Federal programs providing health care or nursing home care benefits, to name but a few. And, where those Federal programs set the eligibility requirements for many of our federally funded State programs, those corresponding State programs will not be allowed to treat same-sex couples as married either, thus excluding them from (or profoundly affecting the calculation of) entitlement to benefits under many such State programs. State officials — not just Federal officials — will, of necessity, have to differentiate between same-sex and opposite-sex couples for all of these State programs. One may decry the unfairness of this different treatment at the hands of the Federal government and its programs, just as the plaintiffs in *Goodridge* decried the unfairness of different treatment under State law, but neither this court nor the Legislature has any power to eradicate those differences or to obviate the need that will arise to distinguish between same-sex and opposite-sex couples for many purposes.

Yet another significant difference stems from the fact that, at present, most States will refuse to recognize a "marriage" license issued by Massachusetts to a same-sex couple. See 28 U.S.C. § 1738C (2000) (States not required to recognize relationship between same-sex couples as marriage even if another State treats that relationship as marriage); P. Greenberg, State Laws Affecting Lesbians and Gays, National Conference

of State Legislatures Legisbriefs at 1 (April/May 2001) (reporting that, as of May, 2001, thirty-six States had enacted "defense of marriage" statutes). Not only would such a couple be deprived of any benefits of being "married" if that couple moved to another State, but such a couple would not have access to that State's courts for purposes of obtaining a divorce or separation and the necessary orders (with respect to alimony, child support, or child custody) that accompany a divorce or separation. See, e.g., *Rosengarten* v. *Downes*, 71 Conn. App. 372, 380-381, appeal dismissed, 261 Conn. 936, 936 n.* (2002) (where Connecticut law did not recognize validity of same-sex couple's union as marriage, court lacked subject matter jurisdiction over dissolution action); Rosenberg, Breaking Up Is Hard to Do, Newsweek 44 (July 7, 2003), noting that, "[i]f gay couples think it's tough to get married, they may find it's even harder to split up"). Ironically, a "marriage" license issued to a same-sex couple will not only fail to entitle that couple to the same array of benefits that normally attend the marriage of opposite-sex couples, but it will not subject them to the same obligations, either — their status as a "married" couple, and therefore all of the obligations that attend that status, can be made to disappear by the simple expedient of moving to another State that will not recognize them as "married." Opposite-sex couples, once "married" in Massachusetts, cannot shed that status and its significant obligations so easily.

It would be rational for the Legislature to give different names to the license accorded to these two groups, when the obligations they are undertaking and the benefits they are receiving are, in practical effect, so very different, and where, for purposes of the vast panoply of federally funded State programs, State officials will have to differentiate between them. That these differences stem from laws and practices outside our own jurisdiction does not make those differences any less significant. They will have a very real effect on the everyday lives of same-sex couples, and the lives of their children, that will unavoidably make their ostensible "marriage" a very different legal institution from the "marriage" enjoyed by opposite-sex couples.[2] That lack of recognition in other jurisdictions is not simply a

---

[2]While many hope that, by way of litigation and lobbying efforts, same-sex couples will ultimately obtain recognition of their Massachusetts "marriages" by the Federal government and by other States, no one predicts, even under the most optimistic scenario, that such widespread recognition will be achieved

matter affecting the intangibles of "status" or "personal residual prejudice," *ante* at 1209, but is a difference that gives rise to a vast assortment of highly tangible, concrete consequences. It is not the naming of the legal institution that confers "a different status" on same-sex couples, *ante* at 1206; rather, that difference in terminology reflects the reality that, for many purposes, same-sex couples will have "a different status."

Not only will the institution itself be different, but those very differences would, in many areas, justify (and, in some cases, require) modifications of our own State law in ways that are unique to same-sex couples in order to address those differences. Such modifications range from the mundane (and almost automatic) to very substantive and complex. To begin with the mundane, while the proposed bill specifies that same-sex couples in "civil unions" can file joint Massachusetts income tax returns, such couples will not be allowed to file joint Federal income tax returns; when, on their Massachusetts returns, they encounter the numerous cross-references to what was entered on a particular line of their Federal return, what figure are they to use? Some regulation or instruction, applicable only to the tax returns of same-sex couples, will inevitably have to be promulgated. On a more substantive level, would it not be permissible (and, in the view of many, appropriate) for the Legislature to provide some form of tax benefit to same-sex couples to recognize that they have been deprived of certain deductions, credits, or other benefits on their Federal income taxes or Federal estate taxes? See, e.g., G. L. c. 62, § 3 (B) (*a*) (9) (providing tax deduction to persons renting their homes where Federal tax law only allows deduction for mortgage interest paid by owners). See also *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 238-240 (1981). Would it not also be permissible (and, in the view of many, appropriate) to establish a program of benefits for same-sex couples and their children to offset the hardship they will encounter as a result of being denied Social Security benefits, health care benefits, and the many other benefits that opposite-

anytime in the near future. It remains to be seen whether it will be achieved at all, as it presently faces considerable — and vehement — opposition from various quarters. The Legislature is entitled to structure and name its licensing programs based on conditions as they presently exist. It is not required to assume the success of yet-to-be-filed litigation and lobbying efforts around the country.

sex married couples (and their children) receive under Federal programs and federally funded State programs? See, e.g., St. 1997, c. 43, § 210 (providing welfare benefits to aliens excluded from Federal benefits program); *Doe v. Commissioner of Transitional Assistance*, 437 Mass. 521, 534-535 (2002). And, would it not be desirable to formulate some mechanism — admittedly complex and difficult to fashion — by which same-sex couples who move out of State could still have resort to Massachusetts courts to enforce the obligations of their union in the event one party or the other wished to dissolve it? Cf. Vt. Stat. Ann. tit. 15, § 1206 (2002) (persons seeking to dissolve civil union must meet residency requirement).

I recognize that the proposed bill does not contain any measures addressing any of these problems. The question, however, is whether it is rational to envision a need to differentiate between these two types of licenses — after all, the 180-day deadline imposed by *Goodridge* does not realistically allow for a review of every one of the "hundreds of statutes" in Massachusetts alone that are "related to marriage and to marital benefits," *Goodridge, supra* at 323, let alone review how differences in Federal law and the law of other States will frustrate the goal of complete equality and require separate statutory or regulatory remedies for same-sex couples in Massachusetts. It is understandable, therefore, that the proposed bill sets forth as its initial goal the overarching proposition that these two programs should be equal and leaves to another day the painstaking task of revising the "hundreds" of provisions that might, in order to obtain equality in a more pragmatic sense, need substantial revision.[3] Moreover, it makes eminent sense to obtain some direct experience with this first in the nation proposed program

---

[3]Beyond the array of problems posed by differences in Federal law and the law of other States, some provisions may need substantial modification merely in order to make sense in their application to same-sex couples. For example, the presumption of paternity (G. L. c. 209C, § 6) reflects reality with respect to an overwhelming majority of those children born of a woman who is married to a man. As to same-sex couples, however, who cannot conceive and bear children without the aid of a third party, the presumption is, in every case, a physical and biological impossibility. It is also expressly gender based: if a married man impregnates a woman who is not his wife, the law contains no presumption that overrides the biological mother's status and presumes the child to be that of the biological father's wife. By comparison, if a married woman becomes impregnated by a man who is not her husband, the presumption makes her husband the legal father of the child, depriving the biological father of what would otherwise be his parental rights. See *Michael H. v. Ger-*

of "civil unions" that are to be the complete functional equivalent of "marriage"; that experience will both identify where the theoretically identical treatment is not identical in reality and simultaneously inform those seeking genuine equality what remedies might best be fashioned to "close the gap." Indeed, once the euphoria of *Goodridge* subsides, the reality of the still less than truly equal status of same-sex couples will emerge, and it will emerge in pragmatic ways far beyond the purely symbolic issue of what their legal status is to be named. There will surely be more to address than mere "administrative details." *Ante* at 1209 n.5.

Where the rights and obligations conferred on same-sex couples by *Goodridge* will not in fact be identical to the rights and obligations of opposite-sex married couples, where State officials will have to differentiate between them under essentially all federally funded State programs, and where it is rational to envision different, yet constitutional, treatment of same-sex couples in the future to address those remaining differences, it is eminently rational to give a different name to the legal status being conferred on same-sex couples by the proposed bill. It is not enough to say that eligibility for current federally funded State programs, or for some future programs or statutory modifications unique to same-sex couples, could be confirmed by some other means; under the rational basis test, the sole question is whether a different name for the license being issued is a rational method of identifying those persons who would be eligible for constitutionally permissible differing treatment in future. It clearly is.

It is of no consequence that the actual purpose that has

<hr/>

*ald D.*, 491 U.S. 110 (1989); *Matter of Walter*, 408 Mass. 584 (1990). Applying these concepts to same-sex couples results in some troubling anomalies: applied literally, the presumption would mean very different things based on whether the same-sex couple was comprised of two women as opposed to two men. For the women, despite the necessary involvement of a third party, the law would recognize the rights of the "mother" who bore the child and presume that the mother's female spouse was the child's "father" or legal "parent." For the men, the necessary involvement of a third party would produce the exact opposite result — the biological mother of the child would retain all her rights, while one (but not both) of the male spouses could claim parental rights as the child's father. Would it not make sense to rethink precisely how this biologically impossible presumption of paternity ought to apply to same-sex couples, and perhaps make some modification that would clarify its operation in this novel context?

motivated the proposed bill may be different from that just articulated. See *Prudential Ins. Co.* v. *Commissioner of Revenue*, 429 Mass. 560, 568 (1999), citing *FCC* v. *Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). The criticism that my articulated rationale "is but a post hoc, imaginative theory created . . . to justify different treatment," and not the actual rationale of the bill's proponents, *ante* at 1208, is therefore beside the point. The rational basis test asks whether there is any conceivable basis for the distinction at issue. The test does not require that the Legislature disclose its actual motives or that those motives be pure.[4] Nor does the test even place the burden on the Commonwealth to demonstrate the existence of a rational basis — rather, it is on those seeking to challenge the legislation to demonstrate the absence of *any* conceivable basis. In my view, the proposed difference in name passes muster under the rational basis test.

A more fundamental problem with the answer given to the Senate today is that it does not apply the rational basis test, but instead announces, without qualification, that the Massachusetts Constitution prohibits "invidious discrimination" or "status discrimination" against, or the imposition of a "different status," "second-class status" or "stigma" on, same-sex couples.[5] *Ante* at 1206, 1207, 1208, 1209. Of course, if the Massachusetts Constitution contained any "equal rights amend-

---

[4]Remarkably, four Justices proclaim that, even if the Legislature creates differences between these statutory schemes for good faith reasons in an attempt to achieve equality, "separate nomenclature" could not be used because its use would still "perpetuat[e] . . . discrimination." *Ante* at 1209 n.5. Apparently, even if the statutory schemes are substantively different and those differences stem from good and valid reasons, there is some constitutional requirement that the statutory schemes bear the exact same name. Again, no precedent whatsoever is cited for this proposition, and it is nonsensical to suggest that substantively different programs must be named identically.

[5]Today's answer to the Senate also assumes that such "invidious discrimination" may be found in the mere name of the proposed licensing scheme. If the name chosen were itself insulting or derogatory in some fashion, I would agree, but the term "civil union" is a perfectly dignified title for this program — it connotes no disrespect. Rather, four Justices today assume that anything other than the precise word "marriage" is somehow demeaning. Not only do we have an insistence that the name be identical to the name used to describe the legal union of opposite-sex couples, but an apparent insistence that the name include the word "marriage." From the dogmatic tenor of today's answer to the Senate, it would appear that the court would find constitutional infirmity in legislation calling the legal union of same-sex couples by any name other than "marriage," even if that legislation simultaneously provided

ment" making sexual orientation the equivalent of the prohibited categories of "sex, race, color, creed or national origin" (art. 1 of the Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution), I would readily agree with those general pronouncements. However, our Constitution contains no such amendment, and *Goodridge* itself did not go so far as to accept the plaintiffs' argument that the court itself, absent such an amendment, should nevertheless treat sexual orientation as a suspect classification for purposes · of equal protection analysis. *Goodridge, supra* at 331 n.21. Nor did *Goodridge* rely on the alternative claim that a "fundamental right" was at stake, such that a "strict scrutiny" analysis was to be applied. *Id.* at 330-331. Rather, the court purported to apply a mere rational basis analysis, the extremely deferential test that is applied to any classification that does not impinge on fundamental rights or employ a suspect classification.

The *Goodridge* opinion employed repeated analogies to cases involving fundamental rights and suspect classifications, while ostensibly not adopting either predicate for strict scrutiny. *Id.* at 359-361 (Sosman, J., dissenting). Today's answer to the Senate's question discards the fig leaf of the rational basis test and, relying exclusively on the rhetoric rather than the purported reason-

that the union of opposite-sex couples was to be called by the precise same name.

Today's answer assumes, in substance, that the "right to choose to marry" as recognized in *Goodridge, supra* at 326, includes the constitutional right to have the legal relationship bear that precise term. Given that *Goodridge* itself recognized that the Legislature could abolish the institution of marriage if it chose, *id.* at 326 n.14, it is hard to identify how the Constitution would be violated if the Legislature chose merely to rename it. Rather than imbuing the word "marriage" with constitutional significance, there is much to be said for the argument that the secular legal institution, which has gradually come to mean something very different from its original religious counterpart, be given a name that distinguishes it from the religious sacrament of "marriage." Different religions now take very differing positions on such elemental matters as who is eligible to be "married" within that faith, or whether (and under what circumstances) the bonds of that "marriage" may be dissolved. The Legislature could, rationally and permissibly, decide that the time has come to jettison the term "marriage" and to use some other term to stand for the secular package of rights, benefits, privileges, and obligations of couples who have entered into that civil, secular compact. Retaining the same term merely perpetuates and adds to the confusion as to what the term means. Whatever the nature of this constitutional right "to choose to marry," *Goodridge, supra* at 326, there is no right to have the State continue to use any particular term with which to describe that legal relationship.

ing of *Goodridge*, assumes that discrimination on the basis of sexual orientation is prohibited by our Constitution as if sexual orientation were indeed a suspect classification.[6] If that is the view of a majority of the Justices, they should identify the new test they have apparently adopted for determining that a classification ranks as "suspect" — other types of persons making claims of a denial of equal protection will need to know whether they, too, can qualify as a "suspect" classification under that new test and thereby obtain strict scrutiny analysis of any statute, regulation, or program that uses that classification. No analysis of why sexual orientation should be treated as a suspect classification was provided in *Goodridge*, and none is provided today. Yet that is, apparently, the interpretation that is now being given to *Goodridge*. The footnote disclaimer of any resort to "suspect classification" and corresponding "strict scrutiny" analysis, *ante* at 1206 n.3, rings hollow in light of the sweeping text of today's answer.

Here, as in *Goodridge*, I remain of the view that the rational basis test is the test to be applied to this issue and, at least in theory, all but one of the Justices in *Goodridge* applied that test.

---

[6]This assumption is most explicit in the answer's invocation of the concept of "separate but equal," suggesting that the different naming of the statutory scheme contains the same type of constitutional defect as that identified in *Brown* v. *Board of Educ.*, 347 U.S. 483, 495 (1954). See *ante* at 1206 & n.3. Of course, that landmark case involved a classification (and resulting separation) based on race, a classification that is expressly prohibited by our Constitution (art. 1 of the Declaration of Rights, as amended by art. 106 of the Amendments of the Massachusetts Constitution) and has long been recognized as a "suspect" classification requiring strict scrutiny for purposes of equal protection analysis under the Fourteenth Amendment to the United States Constitution. See *McLaughlin* v. *Florida*, 379 U.S. 184, 191-192 (1964), citing *Bolling* v. *Sharpe*, 347 U.S. 497, 499 (1954), and *Korematsu* v. *United States*, 323 U.S. 214, 216 (1944). Classifications based on race, and hence any separate but allegedly equal treatment of the races, "must be viewed in light of the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin* v. *Florida*, *supra* at 192. It is that "historical fact" concerning the "central purpose" of the Fourteenth Amendment, *id.*, not how "elegantly [it] decries the denial of equal protection of the laws 'to any person,' " *ante* at 1206 n.3, that subjects racial classifications to strict scrutiny. Here, we have no constitutional provision that has, as either its "central" or even its peripheral purpose, the elimination of discrimination based on sexual orientation. And, notwithstanding the "elegant and universal pronouncements" of our Constitution, *id.*, all but a very few classifications are reviewed under the mere rational basis test.

That same test should be applied to the question before us, and because this proposed legislation passes that test, I would advise the Senate that Senate No. 2175 does not violate the equal protection or due process requirements of the Constitution of the Commonwealth and the Massachusetts Declaration of Rights.

MARTHA B. SOSMAN

I agree with the opinion of Justice Sosman.

FRANCIS X. SPINA

"Shorn of [its] emotion-laden invocations," *Goodridge* v. *Department of Pub. Health, ante* 309, 361 (2003) (Sosman, J., dissenting), and reduced to its legal essence, the court's *Goodridge* decision held that "[l]imiting the protections, benefits, and obligations of civil marriage to opposite-sex couples violates the basic premises of individual liberty and equality under law protected by the Massachusetts Constitution." *Goodridge* v. *Department of Pub. Health, supra* at 342. This holding, while monumental in effect, rested on the slender reed of the court's conclusion that the Department of Public Health had failed to articulate a rational basis for denying civil marriage to couples of the same sex, while permitting civil marriage under Massachusetts law for similarly situated heterosexual couples.

What was before the court, in fairness, was a yawning chasm between hundreds of protections and benefits provided under Massachusetts law for some and none at all for others. That a classification with such attendant advantages afforded to one group over another could not withstand scrutiny under the rational basis standard does little to inform us about whether an entirely different statutory scheme, such as the one pending before the Senate, that provides all couples similarly situated with an identical bundle of legal rights and benefits under licenses that differ in name only, would satisfy that standard. A mere difference in name, that does not differentiate on the basis of a constitutionally protected or suspect classification or create any legally cognizable advantage for one group over another under Massachusetts law, may not even raise a due process or equal protection claim under our Constitution, and the rational basis test may be irrelevant to the court's consideration of such a statute, once enacted.

Assuming, however, that a difference in statutory name would itself have to rest on a rational basis, I would withhold judgment until such time as the Legislature completed its deliberative process before concluding that there was or was not such a basis. Although in normal circumstances, "[t]he [L]egislature is not required to justify its classifications, nor provide a record or finding in support of them," *id.* at 379 (Cordy, J., dissenting), quoting *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 750 (1977), and its enactments need only be supported by a "conceivable" rational basis, *Goodridge* v. *Department of Pub. Health, supra,* quoting *Fine* v. *Contributory Retirement Appeal Bd.*, 401 Mass. 639, 641 (1988), it would not be surprising, in light of the *Goodridge* decision, to find ample documentation of its reasoning and objectives in the proceedings leading up to the legislation's enactment.

In sum, if the new statutory scheme is subjected to and passes the rational basis test, it would be constitutional, and while one could speculate now as to what conceivable bases might exist to justify the difference (see, e.g., *ante* at 1215 [opinion of Sosman, J.]), there is no reason to prejudge the point, and no basis on which to pronounce the task to be impossible.

ROBERT J. CORDY